So the next case on our list is Rayner v. Superintendent Forest SCI. Mr. Stratton, how are you, sir? Good morning, Your Honor. Mr. Morano. And is counsel here for the United Refinery versus the EPA? Yes, Your Honor. So just a heads up, we will grant your motion. So at the conclusion of this argument, we'll take a very brief recess and clear the courtroom and seal. And we're going to ask you to indulge us. And if you two could talk to each other, because we're going to ask for a tutorial, a non-adversarial tutorial on what's at issue here and how the finances work, if you follow what I'm saying. So if you two could get together. How are rings allocated and that kind of thing? Assume complete ignorance, all right? And if you two could get together and work out some sort of maybe a five-minute presentation that gives us the basics before we get into the argument, that would be really helpful. All right? Absolutely, Your Honor. No fighting, no mud-wrestling. Very crucial. All right. Thank you. Out of the sticks where I live, we talk about rims all the time. That's a mud-wrestling event. Well, what would you use it with? Well, you know, the horse doesn't drink it. Actually, if you just want to take advantage of this time and get your tutorial together, that'd be great. And Clinton Horton does not include law students, so they don't get up and leave. You say law students or law clerks? I mean law clerks. I'm sorry, law clerks. Thank you. So we'll call Rainer. That's 21-3230. Mr. Stratton, how are you, sir? Good morning, Your Honor. Sam Stratton, on behalf of Mr. Rainer. I feel like I'm back up the street. Tri-Orphan's Court of Capital Cases. Yeah. We're back in time. Judge Smith v. Bernie Carr v. Altoona and Tom McGrath. Wow, was that a long time. 1988. You were a common pleas judge in Blair County then. Well, let me get serious in this matter. There are two issues that I believe this record is loud and clear. First, the superior court's decision in this case was objectively unreasonable. And second, no rational fact finder could or should find guilt in this particular case. So how specifically was it objectively unreasonable? Objectively unreasonable and specific? Well, let me just show you what's missing. If you look at the superior court decision, and this is before Judge Pinello, Judge Platt, an old friend of mine who wrote it, and Judge Olson. I stood up and argued that case. I was in the argument two minutes, and they told me, sit down. You won. That's called bait and switch. And they told the district attorney, Mr. Walsberger, who now works for the County Commissioners in Chester County, we're sorry, but the judge shouldn't have acted that way. That is, Judge McAree shouldn't have acted that way. Judge McAree and I never got along. They ran against him for DA and other matters. Then four weeks later, we got the opinion. If you look at the opinion, page 7, or best of all, page 7, when they discuss the facts, they don't discuss that there were 11 fingerprints. They just talk about his half brother's fingerprints, and it was highlighted. When they talk about the DNA, they don't discuss there were four other DNA samples on the T-shirt. They mentioned that one of them was probably female. It's not mentioned. That's right. Nothing. They also say, oh, the crime scene guy said it was saliva. You know, I had it around your mouth type of matter. When I read my cross-examination, that crime scene fellow, he agreed with me reluctantly that it's hard to say because that enzyme can be that he says because saliva can be in other matters. So finally, he had to concede it was just presumptively saliva. So these are what's missing. I mean, that's the essence of this case. There is, and this has been 11 years, and maybe the real question is, how did I lose this case? I tried it hard. How did I lose it? And 11 years now, I've been fighting. You can see all the family members and members of the community were sitting in this courtroom. Can I ask you a question at that juncture, since you've asked the question, or perhaps rhetorically asked the question, because without tipping my hand, I do think that there is a paucity of evidence here mustered by the Commonwealth. You asked, how did I lose this? Is it possible, and you were there not only trying but observing, as every experienced trial lawyer does, is it possible that since the defense consisted entirely of alibi witnesses who were cross-examined in such a way as to call their credibility into question, that the jury may just have been turned off by the alibi witnesses and held that against the defendant? We talked to some of the jurors, but I can't tell you because it's not part of the record. All I can tell you is this. What did me in, in that case, was how the trial judge treated me, saying he's not telling the truth about reasonable doubt, reasonable doubt. But he interrupted you, in fact, maybe two times, a couple times. Repeatedly. In fact, if you read the record, I sat down and said, I'm done. I'm not arguing. He said, I'll give you one minute to stand up or you're going to jail or something to that effect. Judge Macri. Macri and I, I first met him at high school football. I was a quarterback and he was a tackle on the opposing team. Not that I'm saying that held against us. Did he sack you in which case? I'm wondering who should hold what against who. Well, you have to see, he's 6'9", and I'm 5'8". But that's, let me get serious here. Because this case means a lot to me. And I'll concede I'm not objective anymore on it. I feel very strongly on this case. But getting back to your answer, there is no evidence that could convict this or convince a reasonable fact finder. There is none. Judge Perkins, who we adored. Well, that's why I asked you the question I asked. Because I read this testimony. And even with that having anything other than the cold record and the words themselves, it occurred to me that the finders of fact here, that all 12 jurors, may have just thought that these alibi witnesses had collaborated, had invented their stories, regardless of what in fact happened, that that was the reaction of the jury. And that's impacted. But if that's the case, and your court erred in not giving me a certificate of appealability on that issue, the DA argued to them, we just found out when they witnessed. Remember, this is not the issue. We only got stuck with sufficiency since the court denied certificate of appealability on the others. But the DA argued, to answer your question, jurors, we just found out when they testified about the alibi. My final alibi notice months before, 8, 10 months before, saying where they were. And that's what he said to them in this particular matter. So perhaps they were influenced by what I consider a highly improper argument. But that's not here. Because forget all that. Forget that the judge was mean to me. Pretend he loved me. In this fact, these facts, it is pure speculation. It's just like the case that Your Honor wrote. Trevelyan. So let me ask you about that. Do you see your case stronger, weaker, on par with Trevelyan? Stronger. How so? Well, Trevelyan had inside the building a folder. He was carrying his left hand with his thumbprint and other matters in there, which he left. Trevelyan, of course. He never tied the folder to the defendant in that case, though. So to me, it's very similar to Trevelyan. And obviously, it was clear as a bell in Trevelyan that whoever planned this, whether him or who was the planner, knew where the safes were and knew where the back door was in that particular matter. And there was no evidence on Trevelyan that he knew. But of course, what's that mean? He could have talked to someone else who worked there and done his dirty deed. But Trevelyan comes down to fingerprints and timing. Your Honor, in that decision, said there's no evidence when those fingerprints were placed on the folder. There is no evidence when those stains were placed on the T-shirt. I asked the chemist or whoever testified in that matter, and Detective Beam said there's no evidence when these fingerprints, where the half-brother was there. Now, Judge Perkins, when I argued this case, well, not argued, but briefly, because he didn't give us argument, but he suggested, well, I might agree with you. But again, a rational fact finder could find to the contrary. It's not alternative ways. I suggest there is no alternative way to convict this client of these crimes on a T-shirt a block and a half away around the corner, 16 feet from the jar, which is in a bush around the corner. When the witnesses said, because they contradict a little, but some said all of them had black T-shirts. Some said one had. And by the way, just the physical. Your Honor made a big deal about that in Trevelyan, that this physical description, well, it didn't rule it out, but it really wasn't precise. In this matter, one witness described two of the people, 5'8", 5'9", 170, 175. Not really fitting in my client's description that you wouldn't know that from the record, because he didn't testify, so he didn't have anything on there. In this matter, the fellow who was in the room said, well, I'm 6'2". The fellow was shorter than I. Descriptions don't match in these particular matters. Say that again, because I was looking for that, too, if there was anything about the description of the prisoners. Well, the descriptions are found in the witness, Ms. Bowles. I'm excusing Mr. O. Outs. He says they're 5'8", 5'9", 175 to 185 pounds, the shooter. And the others were slender and short, not tall. And then we have Ms. Bowles, I mean, Mr. Crawford, the gentleman who they woke up in the back room, who, when questioned, said, I'm 6'2", and the second person was shorter than I, which, I mean, leaves a lot. Like I said, I'm 5'8", and I'm a lot shorter, but that doesn't really give us much hope or help. There's no dispute they were all black males. That's not disputed in this particular matter. Is there evidence about whether the stepbrother lived with the defendant? There is no evidence of record because neither of them testified in this particular matter. I know, but I can't tell you because that would not be fair. We've got to stay with the record in this matter. Look, I mean, I got criticized and rightly so by this excellent lawyer who's opposing me for giving what he said my personal opinion. Well, you did give your personal opinion, including to us in your brief that your client is innocent. I'm not sure I've seen that happen before, but it did happen here. Well, I tell you, I didn't give my personal opinion. I gave you a statement of fact because there's no dispute. It doesn't make it a bad situation to work. But thank you. And we're asking that you reverse this for the reasons we set forth. Thank you. Thank you. Thank you. Good morning, Mr. Is it Morano? Morano. Morano. Good morning. May it please the Court. Gerald Morano, Chief Deputy District Attorney on behalf of the Chester County District Attorney's Office. This Court is asked to affirm the defendant's conviction. What I'd like to start with is I disagree with Counselor's position that there is absolutely no evidence other than the DNA linking his client to this case. The evidence at trial established there were three eyewitnesses. All three of those eyewitnesses testified consistently about five facts. Three males entered Mr. Williams, the decedent's apartment. All three males had guns. All three gunmen were African American. All three gunmen wore shirts over their faces. And all three gunmen were in their 20s. In particular, I'd invite this Court's attention to Aaron Crawford's testimony. And the reason I pick on Aaron Crawford is because he gave the best description. And the reason I think Mr. Crawford's description was the best, because he was in the best situation to observe the petitioner, and he was not present when Mr. Williams was shot and killed. He was in the back bedroom and had awoken after hearing the gunshot. So he might not have been as startled. What did he say? He said this. He described the petitioner. He described first the first gunman, which we allege would be Dominic Lee, had a white T-shirt on his head, was an African American male in his early 20s, about 6 feet, average weight, and in particular of key was not wearing gloves. And he's the one who took that jar. And coincidentally, what did we find is the fingerprint that matched that suspect. The main one is the second gunman, which we would allege was the petitioner. He described as an African American male in his early 20s. And again, as Mr. Stratton pointed out, it would be approximately 6 feet. And we know this. This is what Mr. Crawford said. He was probably about a little bit shorter than I am. The follow-up was, how tall are you? 6'2". So we can estimate approximately 6 feet tall, which was the petitioner's height. He also said he was wearing a black shirt covering his face, and that black shirt had a polo logo on it. And he also described the third gunman as an African American male who wore a white shirt over his head. So Crawford's description of that second gunman matched the petitioner. Same sex, both males. Same race, both African American. Same age, both early 20s. Same height, approximately 6 feet tall. It's key here, too, because as the court mentioned— In terms of height and weight, that would fit me. Except your DNA wasn't also found as evidence that was used in a crime. But I don't know what I have out there that my DNA may be on that I've searched from the beginning of time since I came on this earth until now. I mean, it's so circumstantial. I guess with a very, very strong argument, you could convince the jury to believe that the decision to prosecute Mr. Rainer was not totally irrational. But I'm not sure you can convince them of much more than that. Forget the alibi witnesses out of it. Forget the alibi witnesses. And I know the burden on an appeal of a guilty verdict is incredibly high because it's so deferential. We defer to the judgment of the jurors. But DNA, when there's other DNA samples on there, no idea when the DNA was deposited. Boy. Well, you must also consider three things with the DNA. The location of it. It's not just the petitioner's DNA. It coincidentally happened to end up within a few feet of a jar that was stolen from this crime scene. In addition, where was the DNA found? It was presumed to have been saliva. And why is that so critical? Because that corroborates what all the witnesses said. The DNA at some time, Mr. Rainer probably put that particular T-shirt on. He probably wore it at some time. We don't know when. That to me is what that evidence proves. It wasn't that he was present that night for that crime. But that doesn't prove that he would have saliva on it. And that doesn't prove why that shirt would coincidentally end up in a location close by evidence of a crime that was taken. And not only was that evidence close by to an evidence of a crime, it was his own brother's fingerprint. And there's evidence in the record. Well, I'm not sure that helps you. Because to the extent this relationship between the stepbrother who had the jar and Rainer, that would also tend to show that the stepbrother had access to that. It could show the stepbrother had access to that T-shirt. Well, and I think that goes to parts of the Trevelyan analysis. I was about to ask you that. Because Judge Estrepo wrote that opinion. He asked Mr. Stratton how this case compared. Stronger? Weaker? What's your view? I would say this case is 100 times more strong. Stronger for the prosecution. Yes. Much stronger. And let me explain why. A couple things. First, look at the Trevelyan. The eyewitness in Trevelyan couldn't identify the robber by his race. I think her testimony was she believed he could have been African-American solely by his voice. We don't have that here. She was completely off on his height by about four or five inches too short. And I think what was really telling about that opinion is the court focused on the lack of evidence or lack of investigation done in that case. In particular, there was evidence that that robber grabbed a door by the hinges and removed that door and threw it on the ground. Those fingerprints that were found on that door did not match Trevelyan's. We don't have that here. We have three eyewitnesses putting a very good identification, in particular Mr. Crawford, an additional in Trevelyan. You always state the case now. You started out always stating when you said 100 times stronger than Trevelyan. I was saying a very good description. You basically described the average black American male, six feet tall, average height. But we have the DNA and we have his brother's fingerprint there. And additional, and I think this is key, Trevelyan outlined what you do. You look at is the evidence connected to the crime. I think it's undisputed that a black T-shirt was worn, used in this crime, and it's found at the scene. That shows a connection to the crime. I think it's clear that this jar with the brother's fingerprint, which had what was left in it, the Newport cigarettes, was connected to the crime. The only thing we're missing from Trevelyan is we don't have that second part showing that this evidence was not accessible before him. But we do have that with the jar. How do we know that with the jar? There were three reasons. First, the jar was recently purchased. Second, the jar was never removed from that apartment. And third, neither the petitioner nor his brother ever were seen entering that apartment. So that jar is clear. There was no inaccessibility. And that's important because that jar links as a piece of evidence. This is a sufficiency. This Court is required to consider all the evidence of prosecution. That links to the petitioner's brother, which directly links to the petitioner. Wait, wait, wait. How does the petitioner's brother, that's what bothers me here, the fact that the petitioner's brother is directly linked. One of the things that bothers me. The petitioner's brother is linked to the crime. So if it's his brother, so he's probably guilty. Well, I think the evidence shows that there was a close relationship, that they did, I believe, reside together. And the evidence came from Detective Dutter. Was there evidence that they resided together? From Detective Dutter. Well, then the stepbrother had access to that teacher. And that could be. We don't have to prove every possibility. What we have to do here is look at the evidence. Doesn't it create reasonable doubt? That was for a jury to decide, Your Honor. And the jury decided that. That's important. That's hugely important. Because I asked Mr. Stratton, and he said he knew, but he wasn't able to say because it wasn't in the record. If the detective said the stepbrother resides with the brother, well, that gives the brother access to that teacher. And that's, there could have been that. There could have been a lot of, and that's what Mr. Stratton's brief is, a lot of could have been. What specifically did the detective say? He said he went to the house to serve a warrant on the petitioner. And before he got there, Dominic Lee, who is the half-brother, showed up and intervened and said his brother wasn't home and that he would call him on the phone. And I thought that the evidence, and I'm not 100% certain, but I believe that they said they resided together at the same house. What about the room? Did they say? I don't believe that's in the record, Your Honor. I don't think there's any mention of that. And the one other key thing about. He didn't testify, but is that in the record how big Lee is? I'm sorry, say it one more time. Is it in the record how tall Lee is, Dominic Lee? I'm not sure off the top of my head. Okay. And the other thing, too, with the Trevelyan decision, the end of the day, the Trevelyan decision said you need something more, additional incriminating evidence. And I think, Judge Smith, you hit it right on the head, the false alibi. If you look at those four witnesses that testified, and as a cold record, I agree wholeheartedly, they do not seem credible. Their testimony seemed inconceivable, inaccurate, with inconsistencies, and invented. And it was inconceivable in a couple ways. The fact that they knew their loved one, three of the four alibis were related to the petitioner. The fourth one was his best friend, that they would let him sit in jail and never go forward and tell the police, hey, you know what? He was with me that night at the VFW. That's inconceivable. In fact, three of those four refused to even talk to the detective. The fourth one did. And that was very helpful to the prosecution, because the fourth one initially told the detective that he believed the petitioner was with him at a Valley Forge casino. And it wasn't until they had this meeting at the aunt's house where all three of the alibi witnesses, which makes no sense why they would all meet together, corroborated their story and came up with he was at the VFW. And I agree. As courts have said, false alibi is equivalent to a consciousness of guilt, and at times jurors can consider that as an admission of guilt. I think that was a critical piece of evidence in this case. And I think when this court reviews all the evidence in the light most favorite of the commonwealth, it should find that there was a rational basis, and it was a rational trier of fact that made this decision, and it's not an unreasonable application, and it should affirm his conviction. And unless there's other questions? Thank you very much. Thank you. Thank you. I think you have five minutes. I will probably don't need to say anything more, but I will. I'm winged in Philadelphia. Why don't you start by addressing counsel's argument where he makes a pretty compelling argument that this case is different than Trevelyan? It's much stronger than Trevelyan in terms of no evidence. Stronger for the defense. Say again, sir? Stronger for the defense. Yes. I mean, I just want to comment that jar. That jar had 11 fingerprints on it. That jar, as one of the witnesses quarter said, was always taken outside. You would hold the jar. You would pick out the marijuana you wanted, buy it. The house that was robbed was a marijuana-selling house in this particular matter. So, you know, no one knows when or how. No one knows whether Mr. Dominique Lee, the half-brother, bought marijuana there or not, and that may explain why his fingerprints are there as opposed to 11 others or 10 others. Second, his suggestion, only alibi. So is that the law now? The Commonwealth doesn't prove its case, but the defense has a witness no one believes, so they can convict you even though the Commonwealth has no evidence, because they don't believe some defense witness, don't believe a character witness, don't believe an alibi witness, when the Commonwealth presents nothing other than pure speculation. In Trevelyan, in this particular matter, it's stronger. There's a file folder there. It has his fingerprints on it. Now, we know there's other reasons and why you're in this court. Here, you've got a jar, a block and a half, 200 yards away around the corner with 11 fingerprints, Dominique Lee being one of them. You have 16 feet away a black T-shirt, which could have been worn by other people, could have been taken by the half-brother. We don't know. It's all speculation. Could have been worn by my client. And they played basketball. There was some testimony. You played basketball two blocks away that day from when some of the alibi witnesses in this matter. That's all you have. You don't have the fingerprints there. You don't have the folder there with my client's fingerprints on it. You have nothing at all other than the multiple theories. And where Judge Perkins went wrong is what I suggested earlier. He seemed to suggest, well, I'm giving alternative theories. But Judge Perkins said, gee, I probably would have acquitted. Not quite so strong, but that was the inference. But there's an alternative theory. A rational fact finder could agree with that. And I suggest he couldn't. A rational fact finder could not agree with that at all and these facts. And to put a young man in jail now for 11 years, for 10 years, for a crime he didn't commit in this particular matter. And that's what we're dealing with. And it's very frustrating from my standpoint when you read Jackson, you read the cases, objective decisions of the Superior Court, things of that nature, when the bottom line is this is a real injustice here and it's wrong what's happening. Now, my feelings or passion, obviously, that's why you're deciding the case and not me in this matter. But if you analyze this hard and cold, there's no evidence he was a perpetrator. They dance around it. But you can't prove it in any theory. Did his brother do it or did he do it? Was he there? It's all guesswork. And that's where it's so important that this court protects the due process rights here, the sufficiency of evidence. It's not there. And that jar is just a red herring. Because the bottom line is there's 16 people who are on those t-shirt with jar. They could have gone out and found some of these people. They could have looked. They didn't. I gave them the names of the person who did the killing. They've done nothing. It's not his fault. He's new. He's back to the office. They've done nothing in this matter. But that's not the argument. The argument is, hard and cold, Trevelyan is better for the prosecution, even though they lost, because the document is there. And you could argue, well, yeah, he must have known about this place, and Trevelyan didn't know. Well, what's that mean? Maybe Trevelyan did know. It's just we don't have any evidence of it. But our case, there's nothing there. And I said enough. I would ask that this Court reverse this, because it's a true injustice. That Superior Court decision is objectively unreasonable. I mean, part of it, where they talk about the weight of the evidence, they said, well, if the trial court looked at that, there was absolutely no review whatsoever of that claim. I know the weight of the claim is not before us, but that is an embarrassing opinion. Judge Perkins said it doesn't apply in habeas. He read his decision on that. He wouldn't give me a certificate of appealability on that particular matter. It was that, the judge's comments, and the alibi, the DA. He was a very good friend of mine. He died tragically of brain cancer. He was a great DA. But in this matter, I mean, really, it's very sad. But he was wrong in that closing, and he and I had it out. But we were friends. You're friends outside the courtroom. You fight in the courtroom. That's the way it always works. Thank you. There was no tackling between the two of you, is that right? There was no tackling between the two of you. And no mud wrestling either. No, no. Thank you. Pleasure to be here. Thank you, counsel. We'll take this matter under advisement.